Argued April 16; modified April 30, 1935

BLACKLAW ET AL. *v.* BLACKLAW ET AL.

(44 P. (2d) 728)

*J. K. Weatherford* and *Mark V. Weatherford,* both of Albany (Weatherford & Wyatt, of Albany, on the brief), for appellants.

*John H. Carson,* of Salem, and *Arthur K. McMahan,* of Albany (Marks & McMahan, of Albany, and Carson & Carson, of Salem, on the brief), for respondents.

RAND, J. This suit was instituted by Annie E. Blacklaw and Josephine Blacklaw Marsh against Alma Blacklaw, the widow of plaintiffs' deceased brother, James Q. Blacklaw, and A. W. Bowersox, the administrator of his estate, seeking to impress a trust upon an undivided two-thirds interest in 33 acres of land, the legal title to which was in decedent, and also to impress a trust upon a like interest in the moneys, securities and other personal property which was in his possession at the time of his death. From a decree holding that the decedent was holding a two-thirds interest in said properties in trust for plaintiffs at the time of his death, the defendants have appealed.

The transactions out of which this controversy arose are, in substance, as follows: In 1882, John Blacklaw, the father of plaintiffs and decedent, died in Pawnee county, Nebraska, leaving in straitened circumstances a family consisting of his widow, Margaret E. Blacklaw, and five minor children, Josephine, the oldest, then being about 15 years of age, Annie, James, John and Will. In order to support the family, Josephine secured employment at housework and Annie began teaching in the public schools after reaching the age of 16 years. The three boys worked at whatever jobs they could find to do, and all of them turned their earnings over to their mother. This continued until May 1891, when, in order to better their condition, the mother, with her three sons, drove to Oregon, arriving in Lebanon on September 25 of that year. They brought with them all their possessions, which consisted of two teams, wagons, harness and a few household goods. In order to defray the expenses of the trip and to support the family after their arrival in Lebanon, the two girls forwarded their earnings to their mother and the boys worked at places along the road and after their

arrival in Lebanon. All of them turned their earnings over to their mother, who had less than one dollar when she reached Lebanon. The following spring Annie came to Oregon and Josephine came the next fall, all of them taking up their residence with their mother.

All the members of the family were industrious, saving and thrifty, and, after their arrival in Lebanon, it was agreed that the earnings of all should be put into a common fund and be turned over to James, the oldest boy who was then about 19 years of age, to be held as a joint fund and, as far as necessary, be used for the support of the family, the surplus to be invested for their joint benefit. Under this agreement, James assumed the control and management of all their business affairs and received all their earnings. Annie resumed teaching in Oregon, Josephine worked out and the three boys worked at whatever they could find to do. All of them turned over their earnings to James.

From these family funds and other moneys received from the sale of a leasehold estate in Nebraska, belonging to the mother, James purchased a forty-acre tract of land in what is known as the Tennessee Valley near Lebanon for the sum of $900, taking title thereto in his own name. The consideration was paid partly in cash and the balance secured by a mortgage on the purchased property. At the time of the purchase, 10 acres of the land had been cleared, the balance being in timber and slashings. That year a house was built on the premises at a cost of about $800, and it has since been occupied as the family home. The mortgage was paid and the remainder of the land was cleared and placed in cultivation by the labors of the family during that year.

Under the same arrangement, an adjoining tract of 52 acres was purchased in 1899 for the sum of $1,500, and title taken in the name of John.

In 1902, another tract of 20 acres was purchased and title thereto was taken in the name of Will. A short time after this purchase was made, Will married and, as a settlement of his interest in the common property, he was paid $400 in money and given the absolute title to the 20 acres that had been purchased in his name, following which deeds were executed conveying the other 92 acres of land in equal shares to the mother, the two girls and James and John. Shortly thereafter John married and, as a settlement of his interest in the common property, he was paid the sum of $2,200, and conveyances were made which vested the title to the 92 acres of land in equal shares to the mother, the two girls and James.

In 1924, the mother died and, by her will, she gave and devised all her interests in the common property to Annie and James, share and share alike.

There is no controversy in respect to the title to the 92 acres above referred to. It is admitted that at the time of James' death he owned an undivided three-eighths interest therein, Annie an undivided three-eighths interest, and Josephine a one-fourth interest.

The controversy is in respect to the following matters: Josephine married about 1905 and took up her residence in Walla Walla county, Washington, where her husband had acquired property of his own. There was no settlement made with her, nor was any change made in her one-fourth interest in the property. She received no part of the income and made no contributions to the common fund until after the death of her husband in 1915, except some minor articles which were sent to James for use on the property. After the death of her husband, she sent to James for use on the place an automobile, a span of horses, some harness, a buggy, a carpenter outfit and a blacksmith outfit, a part of

which was included as the separate property of James in the inventory filed in his estate. Josephine returned to the family home in 1929 and has ever since resided there.

The 33 acres in controversy were purchased by James in 1915, he taking title thereto in his own name.

About 1918 Annie and James advanced to Josephine from the common fund $2,500 in money, no part of which has since been repaid.

Since 1905, James realized a considerable profit from his operation of the property, to which was added, until the death of the mother, Annie's earnings as a school teacher. From these moneys, James made numerous loans, taking notes and mortgages therefor in his own name, made certain investments in stock, purchased tools and machinery for use on the lands, and kept a part on deposit in the bank, all of which was done in his own name.

Prior to 1910 and after the family was in prosperous circumstances, at the request of the mother, the moneys realized from the sale of the surplus chickens, eggs and dairy products raised on the place were, with the consent of the other interested parties, turned over to the mother as her separate property. After the mother's death, these proceeds were paid to Annie and were by her, together with her subsequent earnings as a school teacher, deposited in the bank in her own name, and, from the sums so deposited, many of the household expenses were paid and at the time this case was tried in the court below the amount of such deposit was somewhat in excess of the sum of $1,000.

In November, 1932, James died without issue. Some three months prior thereto, he was married to the defendant, Alma Blacklaw, who is his sole heir at law. In the proceedings taken in his estate, the 33 acres of land,

the moneys he had on deposit in the bank, the notes and mortgages standing in his name and certain shares of stock, together with all the tools, machinery and other personal property on the lands, were inventoried and appraised as belonging to him individually, the appraised value thereof being $22,763.64.

In the decision rendered in the court below, the learned trial judge held that, as to the said 33 acres of land and the personalty above referred to, Josephine Blacklaw Marsh, Annie Blacklaw and Alma Blacklaw were each the owners of an undivided one-third interest therein, and decreed that Josephine's one-third interest should be charged with two-thirds of the $2,500 which had been advanced to her from the common fund.

■ While the defendants admit that there was an agreement between the members of the family and that all of their earnings and the proceeds realized from the realty should be intrusted to James as a common fund, and that this agreement was carried out, they contend that the agreement was terminated when the title to the 92 acres of land became vested in equal shares in the mother, the sisters and James, and from that time on they contend that each of said parties was thereafter acting for himself individually and that James was no longer a trustee for the others in respect to any property he subsequently acquired.

The evidence wholly fails to sustain this contention. The whole evidence shows that the agreement which had previously existed between them was still carried out in the same manner and to the same extent as it had been before. The only circumstance relied upon to support the contention is the fact that Josephine no longer resided on the place, nor made any contribution to the common property except as above stated, and that the mother, until her death, received the proceeds from the

sale of the eggs, chickens and dairy products and Annie the same proceeds thereafter. These circumstances wholly fail to show a termination of the agreement or any change in the relations of James to the others or in his disposition of the common property. Until the mother died, Annie continued to turn her earnings over to James, and Josephine received no part of the proceeds realized from her part of the property. The agreement was a family arrangement which had been entered into and was carried out for the benefit of the family. It was one which courts of equity favor and will enforce according to its terms.

While it is true that James managed the property with ability and success and received no larger share of the proceeds as compensation for his services, he was merely performing what he had contracted to do and for the consideration which he had agreed to accept. No change in his relations was ever made or requested by him and, after his death, the courts are powerless to make a new contract for him.

■ It is well settled that where property is purchased with the money of one person and the title thereto taken in the name of another, ordinarily an implied trust will result in favor of the one who furnished the money, and this case, we think, falls within the application of that rule. We think, however, that Mrs. Marsh is not entitled to a one-third interest in the property in controversy.

■ When the mother died in 1924, she had an equitable estate or interest in one-fourth of the 33 acres of land and also in all personal property which had been acquired by James from these joint earnings and accumulations. By her will, her one-fourth interest therein became vested in James and Annie in equal proportions and resulted in making each of them the beneficial

owner of an undivided three-eighths interest therein. All additional property subsequently acquired either by James or by Annie could vest in Josephine no greater beneficial ownership than what she possessed prior to her mother's death. The decree of the lower court must be modified so as to award to Annie Blacklaw and Alma Blacklaw each an undivided three-eighths interest in the trust property and to Josephine Blacklaw Marsh the remaining two-eighths or one-fourth interest therein. We think also that the decree should be modified so as to include within the trust agreement the $1,000 which Annie had on deposit in the bank at the time the case was tried in the court below. She is entitled to retain three-eighths of that sum but the remaining five-eighths should be divided so as to give to Alma Blacklaw three-eighths thereof and to Mrs. Marsh two-eighths. In all other respects the decree of the court below will be affirmed, except that no costs shall be taxed against either party either in the court below or in this court.

Except as so modified, the decree of the lower court is in all respects affirmed.